**Albert E. PERCY et al., Plaintiffs,**

v.

**Peter J. BRENNAN, Secretary of Labor, et al., Defendants.**

No. 73 Civ. 4279.

United States District Court, S. D. New York.

Nov. 8, 1974.

Dennis R. Yeager, Diana Greene, Isabelle Katz Pinzler, Nathaniel R. Jones, William D. Wells, New York City, for plaintiffs.

Paul J. Curran, U. S. Atty., S. D. N. Y., Steven Glassman, Asst. U. S. Atty., Louis J. Lefkowitz, Atty. Gen., Lloyd G. Milliken, Asst. Atty. Gen., New York City, for defendants.

Walter H. Colleran, Doran, Colleran, O'Hara, Pollio & Dunne, P. C., New York City, for Building and Construction Trades Council of New York, etc.

Robert G. Benisch, Berman, Paley, Goldstein & Berman, Robert J. Fink, French, Fink, Markle & McCallion, New York City, for the New York Plan for Training, Inc. etc.

LASKER, District Judge.

This case, brought on behalf of minority persons seeking training and employment in the New York construction industry, challenges the affirmative action plan, ("the New York Plan") which currently governs Federal and State assisted construction projects in New York City. The primary claim raised by the complaint is that the New York Plan fails to guarantee equal protection and the right to equal employment opportunities as required by the United States Constitution, 42 U.S.C. § 1981 and Executive Order No. 11246. At issue also is the validity of federal and state attempts to pre-empt local government efforts to impose affirmative action requirements which are more rigorous than those contained in the New York Plan, although our decision in City v. Diamond, 379 F.Supp. 503 (S.D.N.Y. 1974) has at least partially disposed of this aspect of the case.

The plaintiffs are Albert Percy, Manuel R. Mejia, and John Mercado, who move to represent a class of fellow black and Spanish-surnamed individuals seeking employment in the construction industry, and two organizations, Fight Back and National Association for the Advancement of Colored People (NAACP). Defendants are the Secretary of Labor, the United States Department of Labor, the Assistant Secretary of Labor for Employment Standards, the Director of the Office of Federal Contract Compliance and the Office of Federal Contract Compliance (federal defendants); the Governor of the State of New York, the Industrial Commissioner of the State of New York and the New York State Department of Labor (state defendants); and the Building and Construction Trades Council of Greater New York, the New York Building and Construction Industry Board of Urban Af-

fairs Fund (Fund) and the New York Plan for Training, Inc. (private defendants).

Plaintiffs seek declaratory relief and an injunction ordering the federal and state officials to abandon the New York Plan, to withdraw memoranda which prohibit local governments from imposing any equal employment opportunity requirements which have not been approved by federal and state Departments of Labor, and to promulgate affirmative action goals for public construction sites which comport with the requirements of the United States Constitution, 42 U.S. C. § 1981 and Executive Order No. 11246. Plaintiffs move for a preliminary injunction, partial summary judgment and a class action determination.[1] All defendants move to dismiss. We deal initially with those facts and legal challenges going to the validity of the New York Plan, and then consider the remaining issues.

## I. THE NEW YORK PLAN

### A. FACTS

The New York Plan was established in 1970 to comply with Executive Order No. 11246 (Order) which imposed broad equal employment obligations on federal and federally-assisted contractors. Part I of the order requires that federally-funded contracts include the provision that:

"The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or ter-

mination; rates of pay or other forms of compensation; and selection for training, including apprenticeship." Order at § 202.

The contractor must also undertake to "comply with all provisions of Executive Order No. 11246 . . . and of the rules, regulations, and relevant orders of the Secretary of Labor." Order at § 202.

The Secretary of Labor is responsible for enforcement of the compliance provisions of the order, contained in Parts II and III. Order at § 201. The Director of the Office of Federal Contract Compliance is authorized to implement the equal employment policies of the Secretary of Labor. (Order No. 15–68 of the Secretary of Labor, 33 Fed.Reg. 2600 (Sept. 4, 1968).) Compliance with the order is obtained through adherence either to an "imposed plan" or a "hometown plan".

An imposed plan, as the name indicates, is a plan which is imposed by the Secretary of Labor, establishing yearly minority employment goals on a trade-by-trade basis, with increasing minority participation each year. Responsibility for compliance rests with individual contractors. A hometown plan typically combines the efforts of local contractors and contractors' associations, building trades unions and minority organizations, and results in the formulation of a plan for voluntary compliance with the order. Under a hometown plan, minority participation obligations fall on the trade as a whole rather than on any individual contractor, and can be satisfied by minority employment or training on any work performed by the trade, whether federally-funded or private. The hometown plan approach holds the unions rather than the individual contractors responsible for complying with the affirmative action requirements. An administrative committee assigns "fair share goals" to individual contractors. A hometown plan must be submit-

1. Plaintiffs' motion to consolidate this case with a related one, City v. Diamond, 379 F. Supp. 503 (S.D.N.Y., 1974) is moot in light of our having rendered a decision in that case.

ted to the Office of Federal Contract Compliance for approval and, if approved, is incorporated by reference into Part I of the Federal Equal Employment Opportunity Bid Conditions (Federal Bid Conditions) used for all non-exempt federally-assisted construction projects in the geographical area of the hometown plan.

For any trades not participating in the hometown plan, mandatory affirmative action requirements are set forth in Part II of the Federal Bid Conditions. Responsibility for compliance with these requirements is imposed directly on the individual contractor, rather than on the non-participating trade as a whole.

Part IV of the Federal Bid Conditions provides that the failure of a contractor to make good faith efforts to meet his fair share obligations under a hometown plan can result in his being placed under Part II of the conditions, as well as possible imposition of the sanctions authorized by Section 209 of Executive Order No. 11246.

The federally approved hometown plan in New York City, which is challenged here, is the New York Plan. It was submitted to the federal government for approval in 1970 by the Board of Urban Affairs, a body comprised of labor and management groups. The New York Plan became effective after approval respectively by the Mayor (Executive Order # 31), the Governor (Executive Order # 43) and, in August 1971, by the Office of Federal Contract Compliance. The Plan has been extended from time to time and is presently scheduled to expire at the end of December, 1974.

The New York Plan (Amended Complaint, Exhibit A) (Plan) originally specified that "The number of Trainees the program shall provide for within the first year shall be set at 800 maximum." (Plan, Article IV, of § 2) Goals were established on a craft-to-craft basis, and qualified graduates of the program were to be recommended to the appropriate union "for consideration for membership." (Plan, Article II, § 2).

The Plan expired by its terms on July 1, 1972, but, as indicated already, it has been extended from time to time. The extended plan differs from the original in providing for the training of 1,000 rather than 800 minority workers.[2]

## B. MOTIONS TO DISMISS

The grounds of the motions to dismiss include: (1) the federal defendants' claim that the plaintiffs have failed to exhaust federal administrative remedies; (2) the state and private defendants' claim that the plaintiffs have failed to exhaust federal, state and city administrative remedies; (3) the federal defendants' assertion that the individual plaintiffs lack standing; (4) the private defendants' claim that Fight Back and NAACP lack standing; (5) the state defendants' claim that the State Department of Labor is immune from suit; and (6) their assertion that the complaint fails to state a cause of action against the Governor and the Industrial Commissioner.[3]

1. *Exhaustion of Federal Administrative Remedies Under 28 U.S.C. § 1331.*

The federal defendants move to dismiss for failure by the plaintiffs to submit their complaint to the Equal Employment Opportunity Commission and the Director of the Office of Federal

2. New York City originally was a participant in the New York Plan, but withdrew from the Plan in January, 1973. Thereafter, the City promulgated its own rules and regulations, effective July 20, 1973. These rules and regulations, together with the Mayor's Executive Orders No. 20 of July 15, 1970, and No. 71 of April 2, 1968 constitute the "Mayor's Plan," which imposes an obligation on public contractors, individually rather than by trade, to make among other requirements a good faith effort to employ one minority trainee per four journeymen.

3. While the motions to dismiss, of course, address themselves to the entire complaint, those aspects which we here decide relate to the New York Plan. As already noted, we deal later in the text with those arguments and motions which concern the Brennen Memorandum and the State letter.

Contract Compliance. Their motion is denied because these administrative procedures cannot afford plaintiffs the relief they request.

■ Although Congress established an Equal Employment Opportunity Commission to hear cases involving employment discrimination, the jurisdiction of the Commission is limited to complaints which allege "that an employer, employment agency, labor organization or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice." 42 U.S.C. § 2000e–4. Sections 2000e–2 and 2000e–3, which define "unlawful employment practices," do not include the promulgation of an unconstitutional affirmative action plan.[4]

The cases cited by the federal defendants do not support their claim, for while the court in Hadnott v. Laird, 149 U.S.App.D.C. 358, 463 F.2d 304, 305 (1972) dismissed the complaint for the plaintiffs' failure to appear first before the Equal Employment Opportunity Commission, the claim there essentially alleged that *individual employers* were failing to fulfill their contractual commitment to non-discrimination. Similarly, in Freeman v. Shultz, 153 U.S.App. D.C. 16, 468 F.2d 120 (1972), plaintiff sought to enjoin the award of contracts to *employers* who had discriminated on the basis of race. Yet here, as plaintiffs note, the complaint is not one under Title VII; plaintiffs here are not asking that the sanctions of Executive Order No. 11246 be imposed upon third parties who fail to fulfill contract obligations but that the federal defendants

themselves be enjoined. (Plaintiffs' Memorandum at p. 25). And in a case similar to the one here, where contractors challenged the constitutionality of an "imposed plan" (the Philadelphia Plan) the district court stated, "It is apparent that the legal issue that the plaintiffs here presented is fit for judicial resolution." No indication was made of a previous determination by the Equal Employment Opportunity Commission, which suggests that no such appearance was found to be required. Contractors Ass'n of Eastern Pa. v. Sec'y of Labor, 311 F.Supp. 1002, 1007 (E.D.Pa.1970), aff'd, 442 F.2d 159 (3d Cir.), cert. denied, 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971).

■ Neither can plaintiffs seek relief from the Director of the Office of Federal Contract Compliance.[5] Regulations promulgated by the Office give the Director power to ensure compliance with Executive Order No. 11246, but however broad the scope of those regulations, a complainant may only challenge the alleged discrimination of a "prime contractor or subcontractor", (41 C.F.R. § 1.23(a)), not the unconstitutionality of the contract's equal employment opportunity clause itself.

2. *Exhaustion of Federal Administrative Remedies Under 42 U.S.C. § 1981.*

■■ The state defendants also assert that plaintiffs have adequate remedies under federal statutes.

As noted above, Title VII of the Civil Rights Act of 1964, does not prohibit discriminatory acts by government officials except where the government is the employer. Nor does it proscribe the ac-

---

4. Nor does the legislative history of Title VII of the Civil Rights Act of 1964 contain any indication that Congress envisioned the jurisdiction of the Commission to encompass such a complaint despite the wording of Sections 2000e–2 and 2000e–3. *See* 2 U.S.Code Cong. & Admin.News, 1566 et seq. (1964).

5. The Office has promulgated regulations intended "to achieve the aims of Parts I and II and IV of Executive Order 11246," (4 C.

F.R. § 60–1.1), which empower the Director to review federal contracts "to determine if the prime contractor or subcontractor maintains indiscriminatory hiring and employment practices and is taking affirmative action to ensure that applicants are employed and that employees are placed, trained, upgraded, promoted, and otherwise treated without regard to race, color, religion, sex or national origin." 41 C.F.R. § 61–1.20(a).

tivities of government officials or private entities which operate to foster discrimination by employers or unions.

But even if an action under Title VII were appropriate, Congress specifically rejected the proposition that resort to the remedies of Title VII should be a prerequisite to anti-discrimination suits under 42 U.S.C. § 1981. The House and Senate Committees that reported the bills that became the 1972 amendments to Title VII disavowed any intent to restrict rights under 42 U.S.C. §§ 1981 and 1983. See H.R.Rep. No. 92–238, 92d Cong., 1st Sess. 18–19 (1971); Sen.Rep. 92–415, 92d Cong., 1st Sess. 24 (1971). The House Report states:

> "In establishing the applicability of Title VII to State and local employees, the Committee wishes to emphasize that the individual's right to file a civil action in his own behalf, pursuant to . . . 42 U.S.C. §§ 1981 and 1983, is in no way affected . . . two recent court decisions, Young v. International Telephone and Telegraph Co., 438 F.2d 757 (3d Cir. 1971) and Saunders [sic] v. Dobbs House, 431 F.2d 1097 (5th Cir. 1970), have affirmed this Committee's belief that the remedies available to the individual under Title VII are co-extensive with the individual's right to sue under . . . 42 U.S.C. § 1981, and that the two procedures augment each other and are not mutually exclusive. The bill, therefore, . . . does not affect existing rights that such individuals have already been granted by previous legislation." H.R.Rep. 92–238, 92d Cong., 1st Sess. at 19 (1971), U.S.Code Cong. & Admin.News, 1972, p. 2154.

See Young v. International Telephone and Telegraph Co., 438 F.2d 757, 763–764 (3d Cir. 1971) and Sanders v. Dobbs Houses, Inc., 431 F.2d 1097, 1101 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); see also Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L. Ed.2d 785 (1972).

3. *Exhaustion of State and City Administrative Remedies.*

■ The State and private defendants' claim that plaintiffs have adequate remedies under state and city fair employment practice laws, and that judicial action is appropriate only upon exhaustion of those remedies, also fails. The Commissions established by New York State Human Rights Law and New York City are authorized only to hear complaints involving discriminatory employment practices by employers, employment agencies, labor organizations and apprenticeship committees, N.Y.Exec. Law, McKinney's Consol.Laws, c. 18, §§ 296, 297; N.Y.City Admin.Code § B1–7.0(a)–(c), and have no jurisdiction as to governmental action, or indeed action by any entity not falling within the categories just designated.

■ The plaintiffs cannot be required to exhaust state procedures where there is "no administrative remedy by which plaintiffs could have any assurance of getting the relief they wanted . . . ." Eisen v. Eastman, 421 F.2d 560, 569 (2d Cir.1969); Plano v. Baker, 504 F.2d 595 (2d Cir. 1974) (Slip op.); see McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). As the *Eisen* court stated, "Exhaustion of state administrative remedies is not required where the administrative remedy is inadequate . . . or where it is certainly or probably futile." 421 F.2d at 569. The case at hand supports this position even more strongly than did the facts in *Eisen.* In *Eisen* an administrative remedy clearly existed, which would have been futile to invoke because earlier decisions dictated an adverse outcome. Here the administrative remedy does not even exist as to the subject matter in dispute.

4. *Standing of the Individual Plaintiffs.*

The federal defendants assert that plaintiffs lack standing to seek relief for the class they represent because the claim of discrimination alleged here is not properly directed against them, but

rather is, or should be, lodged against the unions and employers in the New York City building trades, and that therefore the essential "logical nexus between the status asserted by the litigant[s] and the claim [they] present[s]" is missing. Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968). It is true that the amended complaint states:

> "The inability of the plaintiffs and the class they represent to obtain employment or training is the direct result of employment practices of construction industry unions and employers in the New York City area which discriminate against black and Spanish-surnamed persons." (¶ 24)

Yet the fact that contractors and unions discriminate against minority persons in no way precludes the existence of unlawful, if somewhat less direct, discrimination by others.

■ To establish standing a party must allege "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); see Flast v. Cohen, supra 392 U.S. at 101, 88 S.Ct. 1942, 20 L.Ed.2d 947. As black and Hispanic construction workers who allegedly have been and continue to be denied employment in the New York construction industry, the individual plaintiffs have initially demonstrated "a personal stake".

The existence of standing depends first on "whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise", Association of Data Processing Service v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), and second on whether the plaintiffs are "within the class of persons that the . . . provision[s] was designed to protect." *Association of Data Processing,* 397 U.S. at 155, 90 S.Ct. at 831.

The injury alleged here is not, as the federal defendants assert, the denial of job opportunities alone, but rather, as in Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, 395 F.2d 920, 927 (1968), abridgement of "the right not to be subjected to racial discrimination in government programs." The federal defendants are charged with enforcement of Executive Order No. 11246; if they have, by approval of the New York Plan, failed to enforce that order, this approval has "affirm[ed] the discrimination" of the construction industry and has inflicted an injury upon plaintiffs. Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, supra, 395 F.2d at 931; see Barlow v. Collins, 397 U.S. 159, 163–164, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

■ As to the second requirement, the plaintiffs are obviously "within the class of persons that the . . . provision[s] was designed to protect." *Association of Data Processing, supra,* 397 U.S. at 155, 90 S.Ct. at 831. Injuries resulting from racial discrimination fall squarely within the protections of the Fifth and Fourteenth Amendments to the Constitution, 42 U.S.C. § 1981, and Executive Order No. 11246.

### 5. *Standing of Fight Back and NAACP.*

■ The private defendants challenge the standing of the organizational plaintiffs, Fight Back and NAACP. Their argument, however, flies in the face of the Supreme Court's ruling that, "It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); see, e. g., NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Nat'l Welfare Rights Organization v. Wyman, 304 F.Supp. 1346, 1348 (E.D.N.Y.1969).

The amended complaint describes Fight Back as an organization of black and Hispanic construction workers which devotes the majority of its efforts to obtaining employment for such work-

ers in the New York construction industry (¶¶ 6, 29). NAACP is a national organization which seeks to protect the civil rights of black persons (Amended Complaint, ¶¶ 7, 29), and which has previously represented its members in anti-discrimination suits. *See, e. g.*, NAACP v. Button, *supra*; NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). In contrast to the organizational plaintiff in *Sierra Club*, which was found to lack standing because it failed to allege that its members "would be significantly affected by the . . . actions of the respondents," Sierra Club v. Morton, *supra*, 405 U.S. at 735, 92 S.Ct. at 1367, both the members of Fight Back and NAACP and the organizational aims of these two groups are alleged to be directly and adversely affected by the inadequacies of the New York Plan. Under these circumstances the organizations have standing to represent their members. This conclusion is particularly appropriate where, as here, "representation of the interests involved is the primary reason for the organization's existence," United States v. Board of School Commissioners, Indianapolis, Indiana, 466 F.2d 573, 576–577 (7th Cir. 1972), cert. denied, 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1972), or its *"raison d'etre"*, Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, *supra*, 395 F.2d at 937.

■■■ Alternatively, the private defendants move to dismiss as to Fight Back and NAACP on the ground that the organization plaintiffs are not members of the class which the plaintiffs seek to represent, and that a class of persons and associations representing members of the class cannot both proceed as proper plaintiffs. The proposition is unsupportable. Norwalk C.O.R. E. v. Norwalk Redevelopment Agency, *supra*, 395 F.2d at 937. In the only case cited by defendants, Contractors Ass'n of Eastern Pa. v. Sec'y of Labor, *supra*, 311 F.Supp. at 1007, the District Court did dismiss an association after granting class relief. However, in affirming,

the Circuit Court noted, *supra*, 442 F.2d at 166:

"The district court's holding that the Association lacked standing to sue was handed down prior to that of the Supreme Court in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 265 L.Ed.2d 184 (1970), and in the light of that decision and the more recent decision in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), is at least doubtful."

It is not alleged that the aims of the organizations conflict with those of the plaintiffs or the class they seek to represent. *See*, Stewards v. American Airlines, 455 F.2d 41 (7th Cir. 1972). The determination of a class would therefore not alter a finding that Fight Back and NAACP have standing under *Data Processing*.

6. *The Suit Against the State Department of Labor.*

■■■ The claim against the Department of Labor under 42 U.S.C. § 1981 must be dismissed because a state and its agencies are not "persons" within the meaning of the Civil Rights Act. Bruno v. City of Kenosha, 412 U.S. 507, 511–513, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Furthermore, the doctrine of sovereign immunity bars the claim under the Constitution and Executive Order No. 11246, Larson v. Domestic and Foreign Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L. Ed. 1628 (1949); Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1889), and the statutory waiver by New York State of its immunity does not encompass this complaint. Maloney v. New York, 207 Misc. 894, 141 N.Y.S. 2d 207 (Ct. of Claims, 1955), aff'd, 2 A. D.2d 195, 154 N.Y.S.2d 132 (4th Dept. 1956), aff'd, 3 N.Y.2d 356, 165 N.Y.S.2d 465, 144 N.E.2d 364 (1957); Breen v. Mortgage Commission, 285 N.Y. 425, 35 N.E.2d 25 (1941).

#### 7. *The Suit Against the Governor and Industrial Commissioner*

■ Finally, the state defendants argue that the complaint fails to state a cause of action against the Governor and the Industrial Commissioner of the State of New York.

In reviewing a motion to dismiss for failure to state a claim against a state official, the Supreme Court recently reiterated the proposition that "the allegations of the complaint should be construed favorably to the pleader," Sheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (April 17, 1974), and "should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff could prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), cited in Sheuer v. Rhodes, *supra.*

The amended complaint alleges that the Governor of New York is charged with the duty of enforcing equal employment opportunity requirements applicable in the State of New York, and the Industrial Commissioner is responsible for enforcing equal employment opportunity requirements on New York public construction sites. (¶¶ 14, 15) Under the test of *Sheuer,* the amended complaint here clearly states a viable claim against the Governor and Commissioner since proper enforcement of equal employment opportunity requirements is the very essence of plaintiffs' claim. The motion to dismiss the complaint against these officials is therefore denied.

#### C. MOTION FOR A DETERMINATION OF A CLASS

■ Plaintiffs Percy, Mejia and Mercado move for an order allowing this action to be maintained as a class action pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and "all other black and Spanish surnamed persons who are capable of performing, or capable of learning to perform, construction work, and who wish to perform construction work within the jurisdiction of unions that are members of the defendant Building and Construction Trades Council of Greater New York."

Rule 23(a) states:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is unpracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The private defendants argue that plaintiffs have not met the requirements of subdivisions (a)(2) and (a)(3). The complaint seeks recission of federal approval of the New York Plan which by its terms limits the number of trainee positions to a maximum of 1,000 and which makes no provision for skilled minority workers. Any determination as to whether the Plan violates the United States Constitution or Executive Order No. 11246 necessarily involves common issues of law or fact. ((a)(2) of Rule 23) Where, as here, the common issues predominate over any factual disparities among the members of the class, the requirements of Rule 23(a)(2) are satisfied. Cortright v. Resor, 325 F.Supp. 797, 808 (E.D.N.Y.1971), rev'd on other grounds, 447 F.2d 245 (2d Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972); *accord,* Escalara v. New York City Housing Authority, 425 F.2d 853, 867 (2d Cir. 1970), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L. Ed.2d 91 (1970); Norwalk C.O.R.E. v. Norwalk Redevelopment Agency, *supra,* 395 F.2d at 937.

■ Plaintiffs' claims are also typical of the class claims. Rule 23(a)(3). The facts here virtually mirror those in Rios v. Enterprise Association Steamfitters Loc. U. # 638 of U.A., 54 F.R.D. 234, 236 (1973), in which Judge Tenney

approved the maintenance of an action on behalf of a nearly identical class. The fact that *Rios* involved the steamfitting industry and the claim here extends to the New York City construction industry does not, as defendants suggest, render the plaintiffs' claims any less typical than those in *Rios*, or make the proposed class amorphous. Rule 23 sets no geographical or numerical limit as such on the scope of a class. *See* Rosado v. Wyman, 322 F.Supp. 1173, 1190–1192 (E.D.N.Y.1970), aff'd 437 F.2d 619 (2d Cir. 1971), aff'd mem., 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971).

■ The federal defendants argue, however, that although plaintiffs may have met the applicable standards of Rule 23, their pleadings do not establish a need for a class action (Memorandum at page 25). We know of no rule which requires the demonstration of such a need in a 23(b)(2) case, the predicate of which is that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

It is true that the court in Galvin v. Levine, 490 F.2d 1255, 1261 (2d Cir. 1973), approved the denial of a class determination where class relief would be "largely a formality" because "the State . . . made it clear that it understands the judgment to bind it with respect to all claimants; indeed, even before entry of the judgment, it withdrew the challenged policy more fully than the Court ultimately decreed and stated it did not intend to reinstate the policy." No such showing has been made here, and since Rule 23 grants plaintiffs the right to proceed as a class, they are entitled to do so without demonstrating the necessity of class relief. *See* Notes of Advisory Committee on Rules Relating to the 1966 Amendments of Federal Rules of Civil Procedure 23(b)(2), U.S.

C. Appendix 1601 (Supp. III 1967); 3B Moore, Federal Practice, ¶ 23.40 (2d Ed.1969); Wright and Miller, Federal Practice and Procedure: Civil §§ 1775, 1776 (1972). *But see* Tyson v. New York City Housing Authority, 369 F. Supp. 513, 516 (S.D.N.Y.1974) (Metzner, J.); McDonald v. McLucas, 371 F. Supp. 831, 833–834 (S.D.N.Y.1974) (Metzner, J.) We have carefully reviewed the other arguments made in opposition to a class determination, and find them without merit.

Accordingly, the motion is granted allowing this action to be maintained as a class and the class is defined as "all black and Spanish-surnamed persons who are capable of performing, or capable of learning to perform, construction work, and who wish to perform construction work within the jurisdiction of unions that are members of the defendant Building and Construction Trades Council of Greater New York."

### D. MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs move for preliminary relief prohibiting further implementation of the New York Plan.[6] Crucial gaps in the record necessitate denial of the motion even though we recognize that the Plan may well be constitutionally defective.

■ The Plan imposes an obligation to enroll a "maximum" of 1,000 trainees to be employed on all city, state and federally-assisted construction sites in New York City; makes no provision for employment of already skilled non-whites; and establishes no requirement that graduate trainees be accepted into any union. Whether this scheme discharges the duty placed by the order on federal and state officials to compensate for and effectively oversee the eradication of employment discrimination is at the very least extremely doubtful in view of the well-documented history of discrimination by New York City construction in-

6. To avoid a vacuum in which no federally-approved affirmative action plan would be in operation, plaintiffs suggest instatement of the requirements contained in Part II of the Federal Bid Conditions.

dustry unions and employers.[7] If the requirements of the Plan are so minimal that they result, albeit unintentionally, in governmental acquiescence in racially discriminatory practices, then greater efforts are mandated by the Constitution and federal law, and until a more rigorous plan is imposed, the rights of plaintiffs and the class they represent are being violated. *See* United States v. Hayes International Corporation, 415 F. 2d 1038 (5th Cir. 1969); Gautreaux v. Romney, 448 F.2d 731 (7th Cir. 1969); Garrett v. City of Hamtramck, 335 F. Supp. 16 (E.D.Mich.1971); Hicks v. Weaver, 302 F.Supp. 619 (D.La.1969); Ethridge v. Rhodes, 268 F.Supp. 83 (S. D.Ohio 1967).

■ Nevertheless, as plaintiffs candidly admit, an evidentiary hearing is necessary to establish facts which are critical to a determination of the Plan's validity. The actual method by which trainees are selected and employed under the New York Plan is unclear. And the ambiguity of the Plan's provision that a "maximum" of 1,000 trainees are to be included in the program is both puzzling and troublesome. We are reluctant to enjoin the Plan without a developed knowledge of its actual impact in operation.

As the court observed in Pride v. Community School Board of Brooklyn, N. Y. School District # 18, 482 F.2d 257, 270 (2d Cir. 1973), "What is involved [in a motion for a preliminary injunction] is an evaluation of where the equities lie, considering in addition to the hardships such factors as the uncertainty of the issues raised . . .". The question of what minimal goals an affirmative action program must set to satisfy the requirements of Executive Order No. 11246 has never been judicially determined. To grant preliminary relief in a case of first impression which poses such potential widespread ramifications and to do so without the benefit of a fully-developed record would be unwisely premature. Since a hearing on the motion will clearly be protracted (e. g., plaintiffs anticipate calling approximately fifteen witnesses), the hearing will be consolidated with the trial on the merits as provided by Rule 65(a)(2) of the Federal Rules of Civil Procedure.

Having disposed of the motions relating to the Plan, we turn to the remaining issues.

## II. THE BRENNAN MEMORANDUM AND THE STATE LETTER

### A. FACTS

Almost simultaneously with federal approval of the New York Plan, the U. S. Secretary of Labor issued on July 19, 1973, the memorandum (Brennan Memorandum), referred to earlier, which stated that:

> "administering agencies are directed to inform their grantees that where there is a viable and effective hometown or imposed construction industry plan in operation in a geographical area, additional and/or supplementary State or local EEO requirements may not be applied to Federally-assisted construction projects." (Amended Complaint, Exhibit C).

On June 29, 1973, the Industrial Commissioner for the State Department of Labor issued a letter (the State letter) which provided:

> "To insure that the State fulfills its commitment to [affirmative action] plans . . . [i]t is essential that only those plans that have been approved by either the Governor or this Department should be included in the specifications [for all State and State-assisted construction con-

---

7. *See* United States v. Wood, Wire and Metal Lathers, 328 F.Supp. 429 (S.D.N.Y.1971), aff'd 471 F.2d 408 (2d Cir. 1973) (contempt citation for failure to abide by consent decree prohibiting discrimination); United States v. Enterprise Association, Local 638, 360 F.Supp. 979 (S.D.N.Y.1973) (pattern and practice of discrimination by steamfitters' union; discrimination by steamfitting industry employers' association enjoined); United States v. Enterprise Association, Local 638, 347 F.Supp. 164 (S.D.N.Y.1972) (pattern and practice of discrimination by ironworkers' union).

tracts]." (Amended Complaint, Exhibit D).

Subsequently, the State Department of Labor found the Mayor's Plan unacceptable because it was not in accord with the New York Plan.

On January 16, 1974, the U. S. Secretary of Labor, the Assistant Secretary of Labor for Employment Standards and the Director of the Office of Federal Contract Compliance issued a regulation, 39 Fed.Reg. 2365, which was published in the Federal Register on January 21, 1974, to be effective on the date of publishing. It constituted an amendment to 41 C.F.R. § 60–1.4 and, according to its preamble was intended:

> "to clarify the extent to which the U. S. Department of Labor will deem State and local government equal employment opportunity requirements applicable to federally assisted construction contracts subject to the equal employment requirements of Executive Order 11246, as amended, and its implementing rules, regulations, and orders, including Federal equal employment opportunity bid documents incorporating the requirements of voluntary or imposed construction industry plans established pursuant to the Executive Order." 39 Fed.Reg. 2365 (January 21, 1974).

The regulation required any state or local government which intended to impose affirmative action requirements on contractors working on federally assisted construction projects to submit the requirements to the Director of the Office of Federal Contract Compliance for approval. The Director was to render a decision which could be appealed to the Assistant Secretary of Labor for Employment Standards. The regulation further provided:

> "The State or local government affirmative action hiring and/or training requirements shall not be included in federally assisted construction contracts until the Director, or, in the case of an appeal, the Assistant Secretary, has had an opportunity to make a determination in accordance with

this paragraph." 41 C.F.R. § 60–1.-4(b)(2), 39 Fed.Reg. 2365 (January 21, 1974).

Plaintiffs challenge all three regulations as invalid for failure to be published in accordance with federal and state law. They also challenge the Brennan Memorandum as an illegal attempt to preempt local equal employment opportunity programs.

### B. MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs move for partial summary judgment enjoining the enforcement of the July 19, 1973 Brennan Memorandum and the June 29, 1973 State letter.

■ In the companion case, City v. Diamond, *supra,* we determined that the Brennan Memorandum was invalid both because it was not published in accordance with the requirements of the Administrative Procedure Act, 5 U.S.C. §§ 552, 553, and because it was an unauthorized attempt to preempt local equal employment opportunity efforts. The Secretary of Labor and other federal defendants in *Diamond* were enjoined from terminating or withholding federal grant funds for eligible City projects where such termination or withholding occurred solely on the ground that the project was subject to the Mayor's Plan or that the Mayor's Plan exceeded the requirements of the New York Plan. The decision in *Diamond* fits the shoe here and the federal defendants in this case are accordingly enjoined from enforcing the Brennan Memorandum on all federally-assisted construction projects.

■ Plaintiffs next argue that the State letter is invalid because it was not published as required by Article 4, § 8, New York Constitution, and New York Executive Law § 102. Article 4, § 8 of the State Constitution (McKinney 1969) provides:

> "No rule or regulation made by any state department, board, bureau, officer, authority or commission, except such as relates to the organization or internal management of a state de-

partment, board, bureau, authority or commission, shall be effective until it is filed in the office of the department of state. The legislature shall provide for the speedy publication of such rules and regulations, by appropriate laws."

This requirement is implemented by Executive Law § 102 (McKinney 1972) which provides for publication of all rules and regulations in the New York Code of Rules and Regulations (NYCRR). The scope of these provisions has been interpreted by the New York Court of Appeals in People v. Cull, 10 N.Y.2d 123, 218 N.Y.S.2d 38, 176 N.E.2d 495 (1961), in which Judge Fuld stated:

> "The term 'rule or regulation', has not, it is true, been the subject of precise definition, but there can be little doubt that, as employed in the constitutional provision, it embraces any kind of legislative or quasi-legislative norm or prescription which establishes a pattern or course of conduct for the future. The label or name employed is not important and, unquestionably, many so-called 'orders' come within the term."

The State letter establishes a procedure for future approval of affirmative action plans, and therefore falls within the constitutional and statutory publication requirements as construed in People v. Cull. Since defendants do not contest the fact that the letter was never published, the motion for summary judgment is granted, and the State defendants are enjoined from enforcing the terms of the letter without meeting the necessary publication requirements.[8]

## C. MOTION FOR PRELIMINARY INJUNCTION

It follows from our grant to plaintiffs of partial summary judgment that the plaintiffs are entitled to a preliminary injunction restraining the federal and state defendants respectively from en-

forcing both the Brennan Memorandum and the State letter as to locally-administered, public construction sites which receive federal or state assistance as the case may be.

## D. FEDERAL DEFENDANTS' MOTIONS TO DISMISS

The plaintiffs move to dismiss for failure to exhaust the remedy allegedly afforded by the January 1974 regulation.

As indicated above in detail, we held in the companion case of City v. Diamond, *supra*, that the January regulation of the Secretary of Labor was invalidly promulgated and without legal effect. The provisions of the "regulation" therefore afford no administrative remedy for the plaintiffs that need be exhausted before seeking judicial relief.

For the reasons set forth above, the motions to dismiss are denied except as to the New York State Department of Labor. The motions for determination of a class and for partial summary judgment are granted. The motion for preliminary relief is granted to the extent indicated.

It is so ordered.

---

8. The grant of summary judgment against the state defendants is predicated solely on the failure to publish the State letter.

Plaintiffs have not raised issues going to the merits of the letter on this motion and we intimate no views on that subject.