**Nicholas J. DAISERNIA, Plaintiff,**

v.

**The STATE OF NEW YORK, NY State Dept. of Correction, Greene Haven Correctional Facility; Thomas A. Coughlin III, Individually and as Commissioner of the NY State Dept. of Correction; Earl Moore, Individually and as Assistant Commissioner of the NY State Dept. of Correction; James F. Howser, Individually and as an Employee of the NY State Dept. of Correction; Berthlynn Davis-MacIntosh, Individually and as an Assistant Commissioner of the NY State Dept. of Correction; and Gail McGuane, Individually and as an Employee of the NY State Dept. of Correction, Defendants.**

No. 83–CV–699.

United States District Court, N.D. New York.

March 22, 1984.

Jack J. Pivar, Albany, N.Y., for plaintiff.

Robert Abrams, Atty. Gen., Albany, N.Y., for defendants; Judith I. Ratner, Asst. Atty. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

Plaintiff Nicholas J. Daisernia, a white male commenced this action against the State of New York, the New York State Department of Correctional Services ("NYSDCS"), Greene Haven Correctional Facility and five individual state officers or employees, alleging that "defendants' employment practices violated Title VII of the Civil Rights Act of 1964 and deprived him of his constitutional right to equal treatment under the 13th and 14th Amendments to the Constitution, as secured by 42 U.S.C. § 1981 and § 1983." *Complaint* ¶ 2. He seeks reinstatement to the position of Family Reunion Coordinator for Greene Haven Correctional Facility, compensatory damages, punitive damages, back pay from June 1981 to the date of judgment, and attorneys fees.

The Attorney General, on behalf of all the defendants, has moved to dismiss the action pursuant to Rule 12(b)(1), (6), Fed.R. Civ.P. As explained herein, the motion is granted in part and denied in part.

For the purpose of this motion, the material allegations in plaintiff's complaint are accepted as true. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). In January of 1981, plaintiff applied for the position of Coordinator of the Family Reunion Program at Greene Haven Correctional Facility, a state prison for men; his education and past work experience in the field satisfied the publically posted job requirements. After interviewing first with defendant Earl Moore, Assistant Commissioner for the New York State Department of Correctional Services (NYSDCS), then with defendant James F. Howser, Director of Ministerial and Family Services for NYSDCS, and finally with Charles Scully (not named a defendant), Superintendent of Greene

Haven Correctional Facility, plaintiff was told by Howser that he was Howser's and the Department of Ministerial and Family Services' choice for the position. He was informed, however, that the position would first have to be advertised in local papers in accordance with departmental affirmative action rules. About two months later, Howser indicated to the plaintiff that he had been selected and would be appointed prior to June 10, 1981, at which time the job would begin.

At that time, plaintiff was employed by the Postal Department in Tallahassee, Florida. Based on Howser's statements, he resigned his job, losing accumulated benefits, and moved to Greene County, New York.

On June 10, however, plaintiff was informed by Howser that he did not meet the Department's affirmative action eligibility requirements. Subsequently, upon receipt of proof that plaintiff was a disabled veteran, Howser told plaintiff that although he was eligible for affirmative action, the NYSDCS Office of Affirmative Action had determined that the job had been "over advertised" and would have to be re-advertised with lower requirements. A new advertisement, setting forth lower qualifications for the position, was published in July 1981. In early August 1981, plaintiff was informed that a black woman, who had fewer credentials and less qualifications than he, had been appointed to the position.

Although plaintiff denominates five causes of action in his complaint, it is apparent that the first four are variations of the claims pursuant to § 1981 and § 1983 arising out of the above incident. The fifth cause of action, however, contains allegations of four other instances in which plaintiff was denied a position at state correctional facilities (three times at Coxsackie Correctional Facility and once at McGregor Correctional Institution); in each instance a less qualified woman was hired. Plaintiff

therefore claims that the defendants "have engaged in a course of conduct which discriminates against white males, and prefers minorities and women over disabled veterans." *Complaint* ¶ 75.

DISCUSSION

I

The defendants understandably read the complaint as asserting a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, in addition to asserting claims pursuant to § 1981 and § 1983. Their motion therefore seeks dismissal of the complaint for failure to exhaust the administrative prerequisites to seeking judicial relief under Title VII. 42 U.S.C. § 2000e–5.

■ However, as plaintiff has now made clear, he "does not assert a Title VII action. Rather, plaintiff has elected to bring an action under 42 U.S.C. § 1981 and § 1983 providing a parallel federal remedy." *Plaintiff's Supplemental Memorandum of Law* at 4. It is well established that the failure of a claimant to satisfy the administrative prerequisites under Title VII does not preclude him from instituting an action under other civil rights statutes. *See Johnson v. Railway Express Agency*, 421 U.S. 454, 459–460, 95 S.Ct. 1716, 1719–1720, 44 L.Ed.2d 295 (1975); *Goss v. Revlon*, 548 F.2d 405, 407 (2d Cir.1976); *Gresham v. Chambers*, 501 F.2d 687, 690–91 (2d Cir.1974). *See also, Patsy v. Bd. of Regents of the State of Florida*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (exhaustion of state administrative remedies is not a prerequisite to an action under 42 U.S.C. § 1983).

II

■ The defendants next contend that, insofar as the action is brought pursuant to § 1981 and § 1983, it is barred in whole or part by the sovereign immunity of the state under the eleventh amendment.[1] This con-

---

1. The eleventh amendment provides:
   The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against

one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

tention requires separate discussion of each of the invoked civil rights statutes.

## A. *42 U.S.C. § 1983*

[3] 42 U.S.C. § 1983 creates a cause of action for legal and equitable relief against "every person" who, under color of state law, deprives a citizen of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.[2] The Supreme Court has consistently held, albeit over strong dissent, that § 1983 does not abrogate the eleventh amendment immunity of states. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[3] *See also LeGrand v. Evan,* 702 F.2d 415, 417 (2d Cir.1983). Such immunity also bars suit against state agencies.[4] *Pennhurst State School & Hospital v. Halderman,* — U.S. —, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Florida Dept. of Health v. Florida Nursing Home Ass'n.,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1981) (per curiam). *See also, Evans v. Headley,*

566 F.Supp. 1133, 1140 (S.D.N.Y.1983) (New York State Department of Correctional Services is immune from § 1983 suit).

Plaintiff forcefully urges this court to recognize an exception to the holding of *Quern v. Jordan* where, as here, the § 1983 claim alleges race and sex discrimination. He begins by noting that Congress, pursuant to its authority under the fourteenth amendment, authorized actions under Title VII against the states as employers, thereby abrogating the state's eleventh amendment immunity from suit. Equal Employment Opportunity Act of 1972. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). He then characterizes his § 1983 action as a suit to enforce his substantive rights under Title VII (as well as his substantive rights under the thirteenth and fourteenth amendments). Thus, it is plaintiff's position that:

> Congress having specifically abrogated the Eleventh Amendment immunity under Title VII, this court may hold that actions brought under 42 U.S.C. § 1981

---

Sovereign immunity under the eleventh amendment also prohibits a suit in federal court brought by a citizen against his own state. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

**2.** 42 U.S.C. § 1983. *Civil action for deprivation of rights.* Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

**3.** Justice Brennan, dissenting in *Quern v. Jordan,* examined the Civil Rights Act of 1871 in detail and concluded:

> The plain words of § 1983, its legislative history and historical context, all evidence that Congress intended States to be embraced within its remedial cause of action.

440 U.S. at 365, 99 S.Ct. at 1158.

The Chief Judge of this court independently analyzed § 1983 at length, and also concluded

that it was enacted "with the intent to override state sovereign immunity." *Thompson v. State of New York,* 487 F.Supp. 212, 226 (N.D.N.Y. 1979) (Munson, C.J.). He nevertheless dismissed the claims against the state defendants, explaining:

> Reluctantly, this Court is bound by *Quern's* limited reading of the legislative history of Section 1983 and its holding that a State is not a "person" within the meaning of the statute. The Court today must reject the persuasive and haunting voices of a previous era which would not let any form of body politic claim superiority over the Constitutional rights of the people.

Notwithstanding the many voices in dissent, the holding in *Quern* remains the firm view of the Supreme Court, *see Pennhurst State School & Hospital v. Halderman,* — U.S. —, —, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (restating the holding of *Quern*), and is controlling here.

**4.** The Supreme Court's decision in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) did not address the sovereign immunity of state agencies, but was "limited to local government units which are not considered part of the State for Eleventh Amendment purposes." *Id.* at 690 n. 54, 98 S.Ct. at 2035 n. 54.

and § 1983 to enforce Title VII rights are entitled to the benefit of that abrogation.

*Plaintiff's Supplemental Memorandum of Law* at 14.

■ The court is compelled to decline plaintiff's invitation for a number of reasons. First, although § 1983 is undoubtedly available to assert *constitutional* protections against discrimination, Supreme Court decisions indicate that § 1983 does not secure Title VII rights *per se.* In *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Court addressed the scope of 42 U.S.C. § 1985(3) which, like § 1983, provides no substantive rights itself, but merely provides a remedy for certain rights conferred elsewhere. Respondent Novotny sought to invoke § 1985(3) as a vehicle for redressing substantive violations of Title VII, but the Court rejected his claim for reasons that are applicable here:

> Under Title VII, cases of alleged employment discrimination are subject to a detailed administrative and judicial process designed to provide an opportunity for non-judicial and non-adversary resolution of claims. . . .
>
> If a violation of Title VII could be asserted through § 1985(3), a complainant could avoid most if not all of these detailed and specific provisions of law. . . . Perhaps most importantly, the complaint could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII.

*Id.* at 372–76, 99 S.Ct. at 2349–51.

Subsequently, in *Middlesex County Sewerage Authority v. National Sea Clam-*

*mers Ass'n.,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the court turned its attention to § 1983, and offered explicit instructions for determining which statutory rights could be asserted in an action pursuant to that statute. As the Court explained:

> When the remedial devices provided in a particular act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983. As Justice Stewart . . . stated in *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 673 n. 2, 99 S.Ct. 1905; 1945 n. 2; 60 L.Ed.2d 508 (1979) (dissenting opinion), when "a state official is alleged to have violated a federal statute which provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under § 1983."

*Id.* at 20, 101 S.Ct. at 2626.

■ Since Title VII is, perhaps, the quintessential comprehensive remedial scheme, a claimant desiring to enforce his *Title VII* rights—as opposed to the constitutional rights which protect him against employment discrimination—may not do so through an action pursuant to § 1983. *See* L. Larson Employment Discrimination § 52.63 (1983 ed.) *Contra, Huebschen v. Department of Health and Human Services,* 547 F.Supp. 1168 (W.D.Wis.1982); *rev'd on other grds.,* 716 F.2d 1167 (7th Cir.1983) (expressly declining to reach this question).[5]

Moreover, although Congress expressly abrogated state sovereign immunity with respect to claims under Title VII, it did so with the proviso that such claims would be

---

5. In *Huebschen, supra,* plaintiff asserted a § 1983 claim against a state employer, based on allegations of sexual harassment. Title VII was the only substantive basis of the § 1983 claim. The district court examined both *Novotny* and *Sea Clammers,* but concluded that those cases "should be limited to the interplay of the statutes involved . . .: § 1985(3) and Title VII in *Novotny,* and § 1983 and the environmental statutes in *Sea Clammers.*" 547 F.Supp. at 1175.

It therefore concluded that § 1983 could be invoked to assert substantive rights under Title VII.

On appeal, the Seventh Circuit expressly declined to decide whether plaintiff could bring an action under § 1983 to assert Title VII rights, reversing instead upon the ground that the defendant could not be sued under Title VII in any event, and therefore could not be sued under § 1983. 716 F.2d 1167.

subject to the administrative exhaustion requirements of that Act. As the Supreme Court has explained:

> In *Fitzpatrick v. Bitzer*, the Court found present in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the 'threshold fact of congressional authorization' to sue the State as employer, because the statute made explicit reference to the availability of a private action against the state and local governments *in the event the Equal Employment Opportunity Commission or the Attorney General failed to bring suit or effect a conciliation agreement.*

*Quern v. Jordan, supra* 440 U.S. at 344, 99 S.Ct. at 1147 (emphasis added), *citing Fitzpatrick v. Bitzer*, 427 U.S. at 448 n. 1, 449 n. 2, 96 S.Ct. at 2667 n. 1, 2668 n. 2. Thus, the plaintiff here, who chose to forgo the administrative exhaustion requirements of Title VII, cannot claim the benefit of the abrogation of immunity under Title VII; both are inextricable elements of the comprehensive scheme fashioned by Congress.

It is true, as plaintiff points out, that the Court of Appeals in this Circuit once stated that "[n]o greater or lesser protection against discriminatory practices is provided" by § 1983 than by Title VII. *Carrion v. Yeshiva*, 535 F.2d 722 (2d Cir.1976). Though it did not elaborate on its statement in *Carrion* or in subsequent decisions, it is evident to this court that the Second Circuit simply meant that employment practices that violate Title VII would furnish a basis for a § 1983 claim if committed under color of state law; it certainly did not mean to state that the rights of action created by Title VII and § 1983 are identical, since they differ in several important respects.[6] Moreover, the Second Circuit's statement in *Carrion* is qualified by the subsequent Supreme Court decision of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which held that the standard for adjudicating certain claims of employment discrimination in violation of the fifth or fourteenth amendments is not identical to the standards applicable to Title VII claims: the constitutional claim requires proof of an invidious discriminatory purpose, while the statutory claim can be established by proof of a racially disproportionate impact. In light of *Washington v. Davis*, the Second Circuit now holds that employment discrimination suits pursuant to § 1983 based on an equal protection violation require proof of purposeful discrimination. *Knight v. Nassau Cty. Civil Service Comm'n.*, 649 F.2d 157, 161 (2d Cir.1981).

It is clear, then, that Title VII and § 1983 provide parallel, yet distinct, remedies against employment discrimination committed under color of state law; each is subject to its own jurisdictional, procedural, and substantive limitations. For this reason, in Justice White's dissent in *Patsy v. Board of Regents of the State of Florida, supra,* he considered it obvious that an employment discrimination suit brought against a state pursuant to Title VII would encounter "no jurisdictional problem", while a suit based on the same allegations brought pursuant to § 1983 would be barred. 457 U.S. at 529–30, n. 15, 102 S.Ct. at 2575, n. 15.

■ Accordingly, the court concludes that the eleventh amendment completely proscribes plaintiff's § 1983 action insofar as it is asserted against the State of New York, NYSDCS, and Greene Haven Correctional Facility. That bar applies both to the demand for damages and the demand for injunctive relief under § 1983. *Pennhurst State School & Hospital v. Halderman, supra,* —— U.S. at ——, 104 S.Ct. at 908. A question remains, however, as to the extent to which the eleventh amendment also shields the individual defendants herein from the § 1983 claim.

---

**6.** To mention but a few obvious differences, Title VII requires exhaustion of administrative remedies while § 1983 does not; Title VII suits are not triable by jury, § 1983 suits are (at least insofar as monetary damages are sought); Title VII does not provide for recovery of compensatory or punitive damages, but such damages are recoverable in an appropriate action pursuant to § 1983.

"The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.'" *Pennhurst State School & Hospital v. Halderman, supra,* — U.S. at —, 104 S.Ct. at 908, *quoting Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). Thus, a suit which seeks a money judgment "which must be paid from the state treasury is barred by the Eleventh Amendment," even though it is nominally asserted against an individual official. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974). Since plaintiff seeks money damages from the individual defendants "in their official capacity" for acts performed within the scope of their respective offices, recovery, if any, will be from the state treasury; thus the bar of the eleventh amendment applies. *See Monell v. Department of Social Services of the City of New York,* 532 F.2d 259, 265 (2d Cir.1976) (eleventh amendment bars back pay against officials for acts of discrimination within the scope of their offices), *rev'd on other grds.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *See also, Fernandez v. Chardon,* 681 F.2d 42, 59 (1st Cir.1982); *Taylor v. Jones,* 653 F.2d 1193, 1205 (8th Cir.1981).[7]

However, the eleventh amendment does not prohibit the issuance of an order enjoining a state official to henceforth conform his conduct to the requirements of the Constitution. *Pennhurst State School & Hospital v. Halderman, supra,* — U.S. at —, 104 S.Ct. at 908, *citing Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Such prospective injunctive relief is permissible even though it produces an "ancillary effect" on the state treasury. *Edelman v. Jordan, supra,* 415 U.S. at 667–68, 94 S.Ct. at 1357–58. In accordance with these principles, the court holds that the plaintiff may pursue his § 1983 action against the individual state officials insofar as he seeks reinstatement, which would result in only an "ancillary effect" on the state treasury. *See Fernandez v. Chardon, supra,* 681 F.2d at 59.

## B. *42 U.S.C. § 1981*

This statute provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Thus, unlike § 1983 which authorizes a civil action to redress the deprivation of a broad range of rights conferred by the Constitution and other federal statutes, § 1981 authorizes a civil action to secure "a limited category of rights, specifically defined in terms of racial equality." *General Building Contractors Ass'n. v. Pennsylvania,* 458 U.S. 375, 384, 102 S.Ct. 3141, 3147, 73 L.Ed.2d 835 (1982) (hereinafter "GBCA v. Pa."). Although § 1981 complements Title VII in that both address the problem of invidious racial discrimination, "[s]ection § 1981 is not coextensive in its coverage with Title VII;" it is rather an independent avenue of relief. *Johnson v. Railway Express, Inc.,* 421 U.S. at 460, 95 S.Ct. at 1720 (1975). The court therefore rejects, at the outset of this discussion, plaintiff's contention that he may somehow circumvent the state's eleventh amendment immunity on the theory that his action is "brought under § 1981 ... to enforce Title VII rights." Plaintiff's *Supplemental Memo of Law, supra,* at 14. To be blunt, there is no such action.

However, once plaintiff's action is properly viewed as one brought under § 1981 to enforce the rights specified therein, the question of whether the state has immunity

---

7. The complaint specifies that defendant Coughlin, Moore, Davis-MacIntosh, and McGuane are sued in their "official capacity only." ¶¶ 8, 9,

11, 12. The court assumes that the omission of that statement from the allegation identifying defendant Howser is due to inadvertence. ¶ 10.

becomes serious and difficult. As the Court of Appeals for the Fifth Circuit observed in *Taylor v. Jones,* 653 F.2d 1193, 1205 n. 10 (8th Cir.1981):

> It is ... possible that the *Quern* and *Edelman* decisions, which analyze the effect of section 1983 on the states' immunity to damage suits, are not controlling in a suit based on section 1981. The language, purpose and legislative history of section 1981 are not entirely comparable to that of section 1983; thus its effect and scope must be separately examined.[8]

*See also, Gill v. Monroe Cty. Dept. of Social Services,* 79 F.R.D. 316, 335 (W.D. N.Y.1978) (making the same observation but concluding that an action against the state pursuant to § 1981 is barred by the Eleventh Amendment). The Second Circuit has not addressed the issue, and other courts that have are divided as to its resolution.[9]

Those courts that have upheld the state's immunity against § 1981 actions have based their decisions either upon the assumption that *Quern* or *Edelman* are controlling, *e.g., Rucker v. Higher Education Aids Bd.,* 669 F.2d 1179, 1184 (7th Cir. 1982); *Sessions v. Rusk State Hospital,* 648 F.2d 1066, 1069 (5th Cir.1981); *Jones v. Local 520 Intern. U. of Oper. Engineers,* 524 F.Supp. 487, 490 (S.D.Ill.1981); or on the view that a state is not a "person" within the meaning of § 1981 (a view that this court finds misplaced inasmuch as the prohibitions of § 1981 are not expressly limited in applicability to "persons"[10]), *e.g., Percy v. Brennan,* 384 F.Supp. 800, 809 (S.D.N.Y.1974); *Turner v. Baxley,* 354 F.Supp. 963, 968 (D.Vt.1972); or on the authority of one of the aforementioned

cases, or on essentially no apposite authority, *e.g., NAACP v. State of California,* 511 F.Supp. 1244, 1250 (E.D.Cal.1981); *Ganguly v. N.Y.S. Dept. of Mental Hygiene, etc.,* 511 F.Supp. 420, 424 (S.D.N.Y.1981); *Henry v. Texas Tech Univ.,* 466 F.Supp. 141, 146 (N.D.Tex.1979). Cf. *Gill v. Monroe Cty. Dept. of Soc. Services, supra,* 79 F.R.D. at 335 (finding, after brief analysis, no express authorization of suits against the state in the language of § 1981).

Decisions that have permitted the § 1981 action to proceed against a state or agency are similarly unsatisfying, and tend to focus on whether the defendant may be deemed a "person". *E.g., Yarbrough v. Illinois Dept. of Mental Health,* 538 F.Supp. 414, 417 (N.D.Ill.1982); or ignore the issue entirely. *E.g., Whiting v. Jackson State University,* 616 F.2d 116 (5th Cir.1980); *Kirkland v. New York State Department of Correctional Services,* 520 F.2d 420 (2d Cir.1975).

This court, therefore, feels obligated to independently consider the question: did Congress, by enacting § 1981, abrogate state sovereign immunity under the eleventh amendment. As set forth below, the court concludes that although there are strong indications that Congress intended to override state immunity by this statute, those indications do not satisfy the Supreme Court's requirement of "an unequivocal expression of congressional intent," *Pennhurst State School & Hospital v. Halderman, supra,* —— U.S. at ——, 104 S.Ct. at 907, especially when considered in light of historical factors discussed by the Court in *Quern v. Jordan, supra.*

Looking first at the language of the current version of the statute, there is no express authorization of a cause of action

---

**8.** The circuit court then remanded the case for consideration of this issue, but there is no published record of the proceedings on remand.

**9.** The Supreme Court did address whether *federal agencies* enjoy sovereign immunity against a § 1981 action for damages and promotion, and found that there is such immunity. *Brown v. Gen'l Services Admin.,* 425 U.S. 820, 826 n. 8, 96 S.Ct. 1961, 1965 n. 8, 48 L.Ed.2d 402 (1976). However, the considerations involved in deter-

mining whether states are immune under the eleventh amendment are very different.

**10.** *See Skyers v. Port Authority of New York and New Jersey,* 431 F.Supp. 79, 83 (S.D.N.Y.1976) (reasoning that the reference to "persons" in § 1981 described only those persons protected by the statute and not those proscribed from its violation, in contrast with the language of § 1983).

against states. However, the language does not expressly authorize a cause of action against *anyone;* instead, it is framed in terms of an unqualified guarantee: "All persons ... shall have the same right ... as is enjoyed . by white citizens...." As the Supreme Court has observed, that language constitutes "not a 'mere prohibition of state laws establishing or upholding' racial discrimination [with respect to the specified activities] but, rather, an absolute bar to all such discrimination, private as well as public, federal as well as state." *District of Columbia v. Carter,* 409 U.S. 418, 422, 93 S.Ct. 602, 605, 34 L.Ed.2d 613 (1974), *quoting, Jones v. Alfred Mayer & Co.,* 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968).[11]

Turning to the history of the measure, § 1981 has its origin in § 1 of the Civil Rights Act of 1866, which was enacted pursuant to congressional authority under the thirteenth amendment. See generally "Section 1981 and Private Discrimination: An Historical Justification for a Judicial Trend", 40 Geo.Wash.L.R. 1024 (1972). Although, as stated above, the statute has been construed to ban racially discriminatory activity by a broad range of defendants, its primary original target was the activity of *states,* specifically southern states. In its recent discussion of the history of § 1981 in *G.B.C.A. v. Pa., supra,* the Supreme Court explained: ·

> The principal object of the legislature was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on freedmen.... Senator Trumball summarized the paramount aims of his bill:
>
>> Since the abolition of slavery, the Legislatures which have assembled in the insurrectionary States have passed laws relating to the freedmen, and in nearly all States they have discriminated against them.... The purpose of the bill under consideration is to destroy all these discriminations, and to

carry into effect the Thirteenth Amendment. Cong.Globe, 39th Cong., 1st Sess. 474 (1866).

458 U.S. at 386–87, 102 S.Ct. at 3148.

Congress recognized the measure to constitute a potentially radical intrusion of federal power upon the states; it was considered controversial for that very reason. *See generally, Fitzpatrick v. Bitzer,* 427 U.S. 445, 455, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976); *Jones v. Alfred H. Mayer & Co., supra,* 392 U.S. at 449–80, 88 S.Ct. at 2208–23 (Harlan, J., dissenting).

Subsequent to enacting the Civil Rights Act of 1866, Congress passed the fourteenth amendment, which was ratified in 1868. The amendment was prompted, in part, by congressional desire "to eliminate doubt as to the constitutional validity of the Civil Rights Act [of 1866] as applied to the States." *G.B.C.A. v. Pa., supra,* 458 U.S. at 385, 102 S.Ct. at 3147, *quoting Hurd v. Hodge,* 334 U.S. 24, 32–33, 68 S.Ct. 847, 851–852, 92 L.Ed. 1187 (1948). Therefore, in addition to establishing substantive protections against state action, the amendment conferred upon congress, in section 5, the "power to enforce by appropriate legislation, the provisions of this article." That enforcement power included the authority to abrogate the eleventh amendment by providing suits against states or state officials to secure fourteenth amendment rights. *Fitzpatrick v. Bitzer, supra,* 427 U.S. at 456, 96 S.Ct. at 2671.

Returning to the background of § 1981 in particular, the Supreme Court's historical narrative in *G.B.C.A. v. Pa.* explains that:

> Following ratification of the Fourteenth Amendment Congress passed what has come to be known as the Enforcement Act of 1870, 16 Stat. 140, pursuant to the power conferred by § 5 of the Amendment. Section 16 of that Act contains essentially the language that now appears in § 1981. Indeed, the present codification is derived from § 1977 of the

---

**11.** The Supreme Court was actually construing 42 U.S.C. § 1982 in both *District of Columbia v. Carter* and *Jones v. Alfred Mayer & Co.,* but the two statutes are substantially alike in language and origin and are properly analyzed collectively. · *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 410 U.S. 431, 439–40, n. 11, 93 S.Ct. 1090, 1095, n. 11, 35 L.Ed.2d 403 (1973).

revised statutes of 1874, which in turn codified verbatim § 16 of the 1870 Act. 458 U.S. at 385, 102 S.Ct. at 3147. Section 16 of the 1870 Act consisted of two sentences. The first sentence duplicates most of § 1 of the Civil Rights Act of 1866; the second sentence, underscored below, appears indicative of a Congressional intent to override state immunity by this legislation:

§ 16. <u>Be it enacted,</u> That all persons ... shall have the same right ... as is enjoyed by white citizens. <u>No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void.</u>

Although the second sentence is no longer included in § 1981 (perhaps because it was deemed superfluous, inasmuch as § 1981 provides that all persons "shall be subject to like ... taxes,)" it nevertheless suggests that the section as a whole was designed to operate against the state. In short, a reasonable inference from the language of the Enforcement Act is that the second sentence protected all persons from a deprivation *by the state* of a particular right, and the first sentence protected all persons from a deprivation *by any actor*, including the state, of other particular rights.

Thus, to summarize the court's analysis up to this point: the Civil Rights Act of 1866 was enacted to eradicate certain forms of racial discrimination, particularly discriminatory acts by states and state officers. Section 5 of the fourteenth amendment ensured Congress' authority to enforce such a measure; Congress then enacted substantially the same provision in 1870, pursuant to its section 5 enforcement authority. In so doing, it expressly pro-

scribed certain conduct by states. There is, therefore, a weighty argument that Congress, in enacting § 1981, intended to override the sovereign immunity of the states.

Nevertheless, upon a close reading of *Quern v. Jordan, supra,* this court is constrained to acknowledge that the Supreme Court does not subscribe to certain crucial aspects of the above analysis. In rejecting the view that Congress abrogated state sovereign immunity by enacting § 1983 pursuant to its enforcement power under section 5 of the fourteenth amendment, the Court explained:

There is no question that both the supporters and opponents of the Civil Rights Act of 1871 believed that the Act ceded to the Federal Government many important powers that previously had been considered to be within the exclusive province of the individual states.... But neither the logic, circumstances surrounding the adoption of the Fourteenth Amendment, nor the legislative history of the 1871 Act compels, or even warrants, a leap from this proposition to the conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several states.

440 U.S. at 342, 99 S.Ct. at 1145–46.

In a footnote to this passage, the Court opined that "the reigning Constitutional theory of the day" was the view espoused in the *"Prigg-Dennison-Day"* line of cases, *i.e.,* a restrictive view of the authority of the federal government to impose duties upon state officers.[12] *See Monell v. New York City Department of Social Services,* 436 U.S. 658, 672–83, 98 S.Ct. 2018, 2026–32, 56 L.Ed.2d 611 (1978) (discussing *Prigg, Dennison,* and *Day* ).

The fair import of the *Quern* decision, then, is that the Supreme Court will not find an intent to abrogate state immunity in a statute of general applicability that was enacted in an era when a restrictive view of federal power prevailed. In the

---

**12.** *See Prigg v. Pennsylvania,* 16 Pet. (41 U.S.) 539, 10 L.Ed. 1060 (1842); *Kentucky v. Dennison,* 24 How. (65 U.S.) 66, 16 L.Ed. 717 (1861);

*Collector v. Day,* 11 Wall. (78 U.S.) 113, 20 L.Ed. 122 (1871).

final analysis, this court recognizes that § 1981 is a statute of general applicability (even though, as noted previously, the second sentence 16 of the Enforcement Act was applicable to "any State"), and it was enacted when the *Prigg-Dennison-Day* view was the "reigning constitutional theory." The court therefore concludes that § 1981 does not abrogate the sovereign immunity of the defendant State of New York and its agencies.[13]

The defendants' invocation of immunity with respect to the § 1981 claim will be honored to the same extent as with respect to the § 1983 claim: the plaintiff may proceed only against the individual officials, and only for prospective injunctive relief, *i.e.*, reinstatement.

### III

A few issues remain to be resolved. First, the defendants urge that the complaint be dismissed as vague and conclusory. The court assumes the argument to be perfunctory, since there is no question but that the complaint contains sufficient particulars to withstand a motion to dismiss on this ground. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (Federal Rules of Civil Procedure do not require claimant's complaint to set out in detail facts upon which he bases his claim; all that is required is short and plain statement that will give defendant fair notice of what plaintiff's claim is and grounds upon which it rests).

The court also rejects defendants' contention that certain allegations in the fifth cause of action are barred by the three year statute of limitations applicable to claims pursuant to § 1981 and § 1983.

*Pauk v. Bd. of Trustees of the City of New York*, 654 F.2d 856 (2d Cir.1981); *Keyse v. California Texas Oil Corp.*, 590 F.2d 45 (2d Cir.1978). Plaintiff has alleged a policy of continuing discrimination on the part of the defendants, and is therefore entitled to offer proof of events that occurred more than three years prior to the filing of his complaint where such proof is indicative of such continuing discrimination. *See United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

Finally, defendants oppose plaintiffs request for a jury trial. Although a jury trial is available in actions pursuant to § 1981 and § 1983 where legal relief, i.e., money damages, may be awarded, it is not available where, as here, only equitable relief, i.e., reinstatement, may be had. *See Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Lynch v. Pan American World Airways*, 475 F.2d 764 (5th Cir.1973); *Flores v. Local 25, etc.*, 407 F.Supp. 218 (E.D.N.Y.1976).[14]

For the reasons discussed above, the court holds: plaintiff's action pursuant to 42 U.S.C. §§ 1981 and 1983 is dismissed against defendants New York State, New York State Department of Correctional Services, and Greene Haven Correctional Facility; and is also dismissed against all individual defendants to the extent that it seeks to recover monetary damages. Rule 12(b)(1), Fed.R.Civ.P. Plaintiff's request for a jury trial is stricken. Defendants' motion is denied in all other respects.

---

**13.** The Court in *Quern* also reasoned that the absence of any record of legislative debate on the issue of immunity or on the direct financial impact that abrogation would have on states indicated that Congress did not expect that state immunity would be abrogated by § 1983, 440 U.S. at 343, 99 S.Ct. at 1146. Since this court has been similarly unable to locate debate on the immunity question in the legislative history of § 1981, it must draw the same inference with respect to legislative intent.

**14.** Since the court has held that an award of money damages is barred due to eleventh amendment immunity, defendants' motion to strike the prayer from damages for emotional distress of punitive damages is moot. With respect to punitive damages, the court observes again that defendants are sued in their official capacities only.